**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| ALAN GAGIEV | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  26-169 |
| | : | |
| MICHAEL ROSE, et al. | : | |

<u>**MEMORANDUM**</u>

**MURPHY, J.**                                                        **March 9, 2026**

      Over the past several months, many courts in this district and across the country have received habeas petitions from noncitizens living in the United States who were detained without a bond hearing — purportedly under section 1225(b) of the Immigration and Nationality Act (INA).  8 U.S.C. § 1225(b).  Like many other similarly situated petitioners, Mr. Gagiev argues that he is not subject to section 1225(b)'s mandatory detention provision because he has been residing in the United States.  But there is a slight twist: Mr. Gagiev was granted humanitarian parole upon his entry to the United States, and that parole was terminated.  He thus also seeks habeas relief on the grounds that the government revoked his parole in violation of the INA, the Administrative Procedures Act (APA), and applicable regulations.  Because we agree with Mr. Gagiev that section 1225(b) does not apply to him, we order his immediate release and decline to address his other arguments under the INA, APA, and agency regulations.

**I.    FACTUAL BACKGROUND**

      On December 31, 2024, Alan Gagiev arrived at the Customs and Border Patrol (CBP) agency in Calexico, CA with his family and expressed his intent to seek asylum in the United States.  DI 1 at ¶ 2.  That same day, Mr. Gagiev was issued a Notice to Appear (NTA), which listed him as "an arriving alien" and set a removal hearing date for Mr. Gagiev of June 4, 2025.  DI 1-3 at 2-3.  The NTA stated that Mr. Gagiev's grounds for removal were based upon 8 U.S.C.

§ 1182(a)(7)(A)(i)(I) — interchangeably referred to as section 212(a)(7)(A)(i)(I) — which renders inadmissible, and subject to removal:

> an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 211(a) of the Act.

8 U.S.C. § 1182(a)(7)(A)(i)(I); DI 1-3 at 5.

Shortly thereafter, CBP interviewed Mr. Gagiev for his potential asylum claim and, on January 2, 2025, CBP granted him temporary humanitarian parole under 8 U.S.C. § 1182(d)(5). DI 1 at ¶¶ 2-3. Mr. Gagiev was given an "Admit until" date of December 29, 2026. DI 18 at 2; DI 18-1 at 1. However, on approximately April 11, 2025, the government claims it sent a "Notice of Parole Termination" to Mr. Gagiev and other individuals previously paroled into the United States, though the government notes that it has not confirmed yet whether Mr. Gagiev was notified of his change in parole status at this time. DI 18 at 2.[1] According to Mr. Gagiev, no government official spoke with him about parole, nor explained to him what would happen after his I-94 admission expired. DI 13-1 at ¶ 2; DI 1-3 at 8. Additionally, the government asserts Mr. Gagiev was paroled because "the facility that processed [his] family did not have the capabilities to house family units" and "[t]he purpose of [his] parole was to place him immediately into removal proceedings, while ensuring proper adjudication of any eligibility for relief[.]" DI 12 at 2.

On May 30, 2025, the government notified Mr. Gagiev that it was denying his application

---

[1] Due to this revocation, the government asserts that the effective date of termination for Mr. Gagiev's parole was April 18, 2025. DI 18 at 2.

for employment authorization based on his parole because his parole had expired or terminated. DI 18-2.  The government maintains that this notification thus provided notice to Mr. Gagiev that his parole was terminated.  DI 18 at 2.

Meanwhile, Mr. Gagiev filed a timely application for asylum, attended his immigration court hearings, applied for a social security card, obtained work authorization, and became gainfully employed.  DI 1 at ¶ 4; DI 13 at 13-14, 17, 26.  Then, upon attending a scheduled immigration check-in in early January 2026, ICE arrested and detained Mr. Gagiev purportedly under 8 U.S.C. § 1225(b) — also referred to as section 1225(b).  *Id.* at ¶ 5.  Mr. Gagiev asked one of the ICE officers why he was being detained despite his I-94, pending asylum application, work authorization, and immigration court hearing notice.  DI 13-1 at ¶ 10.  The officer, who stated that he was the head of the office, apologized and further stated, without looking at Mr. Gagiev's documents, that he had an order from President Trump to detain Mr. Gagiev.  *Id.* at ¶¶ 10-13.  At no point before, during, or after this interaction did any government official ask Mr. Gagiev about his parole.  *Id.* at ¶ 14.

The government confirms that the DHS Secretary did not issue any opinion addressing Mr. Gagiev's parole, but rather that the Secretary is taking action pursuant to Executive Order 14159, which directs her to "promptly take appropriate action to use all [] provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States."  DI 12 at 3 (citation omitted).  On January 12, 2026, Mr. Gagiev filed the instant petition for writ of *habeas corpus*, to which we now turn.  DI 1.

## II.    MOTION AT ISSUE

Mr. Gagiev's petition for writ of *habeas corpus* asserts the following claims: (1) two violations of the Administrative Procedures Act (APA) under 5 U.S.C. § 706(2)(A), one for conduct not in accordance with the law and in excess of statutory authority, and the other for arbitrary and capricious conduct; (2) a Fifth Amendment due process violation; and (3) a violation of the *Accardi* doctrine[2] established in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  DI 1 at ¶¶ 24-41.  He asserts that we have jurisdiction to review his *habeas* petition under 28 U.S.C. § 2241 because 8 U.S.C. § 1252's jurisdiction-stripping provisions do not apply to such review.  DI 6 at 3 (citing *Demore v. Kim*, 538 U.S. 510, 517 (2003)).  Nor, he claims, is he improperly asking us to review "an action taken as part of his removal proceedings" because his detention is "a separate action taken outside of his intent to seek asylum before an immigration court."  *Id.*

Mr. Gagiev argues that his arrest and detention were not "based on changed circumstances, additional information, or newly discovered security concerns" applicable to him, but instead occurred as "part of the current administration['s] goal of deporting as many people as possible, as quickly as possible."  DI 1 at ¶ 5.  He asserts that his "abrupt revocation of his parole and detention violates the Administrative Procedures Act (APA) and the agency's own regulations."  *Id.* at ¶ 7.  According to Mr. Gagiev, the Department of Homeland Security (DHS) Secretary may revoke parole only when a DHS official with authority determines that either "the

---

[2] This doctrine requires government officials to follow applicable agency regulations. *Accardi*, 347 U.S. at 268 (reviewing and reversing the agency because it "fail[ed] to exercise its own discretion, contrary to existing valid regulations.").

purpose for which parole was authorized has been accomplish[ed] or that neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." *Id.* at ¶ 19 (citation modified).  In support, Mr. Gagiev lists various cases from other districts, as well as a First Circuit decision,[3] finding that "[s]ection 1182 requires an individualized case-by-case determination before parole can lawfully be revoked." *Id.* Additionally, Mr. Gagiev argues that there has been no indication that an authorized DHS official made a determination, individualized to him, nor a determination that "the purpose for which [his] parole was authorized has been accomplish[ed] or that neither humanitarian reasons nor public benefit warrants [his] continued presence . . . in the United States." *Id.* at ¶ 21 (citation modified).  Thus, Mr. Gagiev maintains that the revocation of his parole and his detention violated his rights under 8 U.S.C. § 1182(d)(5)(A) and applicable regulations. *Id.*  Nor, Mr. Gagiev argues, does section 1225(b)(2)(A)'s mandatory detention provision apply to him or others "who have already entered and were residing in the United States at the time they were apprehended." *Id.* at ¶ 22.  Mr. Gagiev asks us to (1) issue a writ of *habeas corpus* requiring his immediate release; (2) declare that his detention and revocation of parole were unlawful; and (3) award him attorneys' fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, and on any other legally justified basis. *Id.* at 9.

The government opposes Mr. Gagiev's petition, arguing that it should be dismissed for lack of jurisdiction or, in the alternative, denied on the merits.  DI 4 at 6.  From the government's perspective, Mr. Gagiev asks us to intervene in his removal proceedings, which we are precluded

---

[3] In particular, Mr. Gagiev cites *Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123 (D. Or. 2025), and *Doe v. Noem*, 152 F.4th 272 (1st Cir. 2025).  DI 6 at 3.

from doing under 8 U.S.C. §§ 1252(a)(2)(B)(ii), 1252(b)(9), and 1252(g). *Id.* at 8-14. The government asserts that (1) its discretionary decision to begin removal proceedings against Mr. Gagiev includes the decision to detain him during those proceedings; (2) by challenging the lawfulness of his detention, Mr. Gagiev's petition requires us to answer legal questions arising from "an action taken to remove an alien"; and (3) the agency's charge determination regarding Mr. Gagiev's inadmissibility is a discretionary decision within the meaning of section 1252(a)(2)(B)(ii). *Id.* at 9-11 (citations omitted). It further insists that we lack jurisdiction under the APA to review DHS's discretionary decision to terminate Mr. Gagiev's parole. *Id.* at 12-14. The government moreover maintains that Mr. Gagiev remained an inadmissible arriving alien — regardless of his grant of discretionary parole and the later revocation thereof — such that he is lawfully and constitutionally detained. *Id.* at 14-19.

After the government filed its response to Mr. Gagiev's petition, it alerted us to a recent decision from Judge Kenney in this district, *Vasquez-Rosario v. Noem*, 2026 WL 196505 (E.D. Pa. Jan. 26, 2026). DI 5. The government attempts to distinguish Mr. Gagiev's case from *Vasquez-Rosario* by asserting that Judge Kenney "rejected a similar government argument relying on the 'arriving alien' distinction . . . by placing great weight on the government's reclassification of the petitioner in that matter in a superseding Notice to Appear as an 'alien present in the United States' who had 'arrived in the United States' one year before." *Id.* at 1. In contrast, the government says that there was no such reclassification or superseding NTA here. *Id.* Mr. Gagiev urges that *Vasquez-Rosario*'s holding "applies with equal force here" because it necessarily excludes him from the reach of mandatory detention under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). DI 6 at 3-4.

On February 12, 2026, we ordered the government to file the documentation serving as the basis for Mr. Gagiev's detention — including, for example, any judicial or administrative warrant for his detention. DI 7. The government responded that it did not have any judicial or administrative warrant for Mr. Gagiev's detention because 8 U.S.C. § 1225 does not require such a warrant to detain him. DI 8 at 1. From its perspective, "the record now before the Court contains all documentation needed to authorize the detention of [Mr.] Gagiev." *Id.* at 2. Thus, the sole basis relied upon by the government to detain Mr. Gagiev is 8 U.S.C. § 1225(b)(2).

On February 17, 2026, we ordered supplemental briefing from both parties as to the applicability of the "entry fiction" doctrine described in *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953).[4] DI 9 at ¶ 5. We also asked the government to provide additional information and evidence regarding a series of questions, focused on the circumstances of Mr. Gagiev's parole and detention, and we requested a declaration from Mr. Gagiev regarding these and related questions. *Id.* at ¶¶ 2-3. The parties provided the requested briefing and information. DI 12; DI 13; DI 16, DI 18. Mr. Gagiev argues that the entry fiction doctrine does not apply to him because he "has established connections in this country" over the past twelve months, was authorized to enter the community, reside there, and work there, and has not been under DHS's custody and control during this extensive period. DI 13 at 10-18. He insists that this doctrine is narrow and limited to the factually distinct circumstances of the individuals detained in *Mezei*

---

[4] The "entry fiction" doctrine — specific to the immigration context — states that noncitizens who are paroled into the United States, even for years pending removal, "are 'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 591 U.S. at 139 (citing *Mezei*, 345 U.S. at 215).

and *Thuraissigiam*, who lacked such connections and authorizations and were kept under the custody and control of the immigration authorities. *Id.* at 11-16. The government argues that the entry fiction doctrine supports its position that Mr. Gagiev squarely falls under § 1225(b)(2)(A)'s mandatory detention requirement because, under this doctrine, Mr. Gagiev was and remains "an 'arriving alien' who is an 'applicant for admission.'" DI 16 at 1-7.

## III.    LEGAL STANDARDS

### A.    Reviewability and relief in the immigration context

It is our emphatic "province and duty . . . to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). This fundamental principle of judicial review extends both to questions of constitutional law, such as whether the privilege of a writ of habeas corpus was unconstitutionally suspended, as well as to questions of statutory interpretation. *Id.* at 178-80; *I.N.S. v. St. Cyr*, 533 U.S. 289, 302-03 (2001) (superseded by 8 U.S.C. § 1252(a)(2)(D), as recognized in *Wilkinson v. Garland*, 601 U.S. 209, 218 n.3 (2024), which restored jurisdiction over constitutional claims and questions of law). And when an administrative agency interprets a statute, we apply a strong presumption in favor of judicial reviewability of that interpretation. *Kucana v. Holder*, 558 U.S. 233, 251-52 (2010); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020). This well-settled presumption may only be rebutted by clear and convincing evidence. *Kucana*, 558 U.S. at 251-52. We also must consistently apply this presumption of reviewability to agency interpretations of U.S. immigration law. *Guerrero-Lasprilla*, 589 U.S. at 229.

### i.    Habeas corpus

"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in

Cases of Rebellion or Invasion the public Safety may require it."[5]  As a federal district court, we can grant *habeas* relief to a petitioner who is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."  *St. Cyr*, 533 U.S. at 301 (citations and footnote omitted).  This includes challenges to "detentions based on errors of law, including the erroneous application or interpretation of statutes" in addition to constitutional violations.  *Id.* at 302-303 (footnotes omitted).  And though Congress may "preclude judicial review of constitutional claims[,]" to find such preclusion, Congress's "intent to do so must be clear."  *Kim*, 538 U.S. at 517 (citations omitted).

Even more clarity is required when *habeas* relief is implicated.  "[W]here a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent."  *Id.* (citing *St. Cyr*, 533 U.S. at 298, 308-09).  Two Supreme Court cases are illustrative.

In *Kim*, an individual who was a Lawful Permanent Resident (LPR) was charged as removable due to a criminal conviction and detained pending his removal hearing.  *Id.* at 513-14.  He challenged the constitutionality of holding him in mandatory detention pursuant to 8 U.S.C. § 1226(c) — a provision which "mandates detention during removal proceedings for a limited class of deportable aliens" — arguing that the agency violated his due process rights by failing to make any determination that he was either a flight risk or a danger to society.  *Id.* at 514-18.  The

---

[5] Found in Article I, Section 9, Clause 2 of the Constitution, this is known as the "Suspension Clause."

Court determined that Mr. Kim was not challenging the Attorney General's discretionary judgment nor decision regarding his release or detention, but that he was rather challenging the statutory framework permitting his detention without bail. *Id.* at 516-17 (citation omitted). Thus, the Court held that 8 U.S.C. § 1226(e) — which states that "[t]he Attorney General's discretionary judgment regarding the application of this section [dealing with the '[a]pprehension and detention of aliens'] shall not be subject to review" and that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole" — did not bar review of Mr. Kim's claims because section 1226(e) contained neither an explicit provision precluding *habeas* review, nor a clear textual bar to constitutional challenges to the legislation authorizing his detention without bail. *Kim*, 538 U.S. at 516-17 (citation modified). Accordingly, the *Kim* Court determined that federal courts have jurisdiction to review constitutional challenges to section 1226(c). *Id.* at 517-18.

St. Cyr is also instructive. There, a noncitizen facing removal brought a *habeas* petition challenging the Attorney General's conclusion that he was ineligible for discretionary relief — in the form of a waiver of deportation — "as a matter of statutory interpretation." *St. Cyr*, 533 U.S. at 293, 298. Mr. St. Cyr did not dispute (1) the facts establishing his deportability; (2) the conclusion that he was deportable; (3) nor that he would be entitled to judicial review of the Attorney General's exercise of discretion. *Id.* at 298. Reasoning that the Suspension Clause "unquestionably" requires "some judicial intervention in deportation cases[,]" the Court highlighted that the judiciary has continuously "answered questions of law in habeas corpus proceedings brought by aliens challenging Executive interpretations of the immigration laws[]"

10

— including questions of law arising in the discretionary relief context.[6]  *Id.* at 300, 306-07

(citation modified) (citations and footnote omitted).  Against this backdrop, the Court determined

that general habeas jurisdiction under 28 U.S.C. § 2241 was not barred by sections 1252(a)(1),

1252(a)(2)(C), nor 1252(b)(9).  *St. Cyr*, 533 U.S. at 312-314 (citing 8 U.S.C. §§ 1252(a)(1),

(a)(2)(C), and (b)(9)).  Indeed, the Court concluded that neither the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA)[7] nor the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996 (IIRIRA) (which amended the INA and is codified at various sections

of 8 U.S.C., including sections 1225, 1226, and 1252),[8] preclude habeas jurisdiction.  *Id.* at 314.

## ii.    Immigration and Nationality Act

### a.    Detention provisions

We begin with the INA's detention provisions.  8 U.S.C. § 1225 governs the

"[i]nspection by immigration officers" of "[a]liens" and provides for the mandatory detention

and expedited removal of certain "inadmissible arriving aliens."  *Id.*  Section 1225(a)(1) pertains

to "[a]liens treated as applicants for admission" and states:

> An alien present in the United States who has not been admitted or who arrives in
> the United States (whether or not at a designated port of arrival and including an
> alien who is brought to the United States after having been interdicted in
> international or United States waters) shall be deemed for purposes of this chapter

---

[6] The *St. Cyr* Court highlighted the difference "between eligibility for discretionary relief" under statutory standards, which provide "a right to a ruling on an applicant's eligibility" *versus* "the favorable exercise of discretion" which is "not a matter of right under any circumstances[.]"  *Id.* at 307-08 (citations omitted).

[7] Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified in scattered sections of 8, 18 U.S.C.).

[8] Pub. L. No. 104-208, 110 Stat. 3009-546 (1996) (codified in scattered sections of 8 U.S.C., including sections 1225, 1226, and 1252).

an applicant for admission.

8 U.S.C. § 1225(a)(1). Section 1225(b), in turn, requires the mandatory detention — without a

bond hearing — of two groups of "applicants for admission." 8 U.S.C. §§ 1225(b)(1)-(2). As

Judge Kenney from this district cogently explained in a recent opinion:

> First, those noncitizens are "inadmissible" to the United States either because they
> lack proper entry documents or because they engaged in fraud or willfully
> misrepresented a material fact on their application for admission. 8 U.S.C.
> § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility).
> Second, those noncitizens fall into at least one of two provisions of the expedited
> removal statute: (1) they "[are] arriving in the United States[,]" 8 U.S.C.
> § 1225(b)(1)(A)(i), and thereby fall into what is known as the "Arriving Aliens
> Provision"; and/or (2) they "have not been admitted or paroled" into the United
> States and have "not affirmatively shown" to an immigration officer's satisfaction
> that they have been "physically present in the United States continuously for [a]
> 2-year period immediately prior to the date of the determination of
> inadmissibility[,]" *id.* § 1225(b)(1)(A)(iii)(II), and thereby fall into what is known
> as the "Designation Provision."

*Vasquez-Rosario*, 2026 WL 196505 at *3 (citations omitted). So, section 1225 pertains

to noncitizens who (1) are inadmissible because they lack proper entry documents or

engaged in a willful misrepresentation of fact or fraud on their admission application **and**

(2) fall within either the INA's "Arriving Aliens Provision" or "Designation Provision."

*Id.*

   If the individual is deemed inadmissible and neither demonstrates his intent to apply for

asylum nor indicates his fear of prosecution, torture, or returning to his country of origin, then

the immigration officer will issue a Notice and Order of Expedited Removal. 8 C.F.R.

§ 235.3(b)(2)(i); *Vasquez-Rosario*, 2026 WL 196505 at *3. Individuals placed in expedited

removal proceedings pursuant to section 1225(b)(1) are mandatorily detained. *Vasquez-Rosario*,

2026 WL 196505 at *3 (citing 8 U.S.C. §§ 1225(b)(1)(B)(ii), (iii)(IV)). They also will be

subject to mandatory detention if they are "an alien who is an applicant for admission" and "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A).  This includes "noncitizens who are arriving in the United States, seeking admission, and are inadmissible for some reason other than misrepresentation or failure to meet document requirements (such as those having certain types of criminal convictions or those who would pose a foreign policy risk or are associated with terrorists, the Communist party, or Nazi activity)."  *Vasquez-Rosario*, 2026 WL 196505, at *4 (citation omitted).  Taken together, sections 1225(b)(1)-(2) require continued detention until either the officers finish considering the asylum application (section 1225(b)(1)(B)(ii)) or until the removal proceedings conclude (section 1225(b)(2)(A)).  *Jennings v. Rodriguez*, 583 U.S. 281, 299 (2018) (citations omitted).

Different provisions of the INA apply to "aliens already present in the United States." *Jennings*, 583 U.S. at 303 (citing 8 U.S.C. § 1226).  Section 1226(a) permits, based on a warrant issued by the Attorney General, the arrest and detention of "an alien" pending a decision on whether he will be removed.  8 U.S.C. § 1226(a).  So long as the individual does not fall under section 1226(c), he falls under section 1226(a) and, per federal regulations, must receive a bond hearing at the outset of his detention.  *Jennings*, 583 U.S. at 306 (citing 8 U.S.C. §§ 1226(a), (c); 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)).

**b.    Parole provisions**

Section 1182(d) of the INA provides for the temporary admission of noncitizens. 8 U.S.C. § 1182(d).  Subsection (5)(A) enables the DHS Secretary to temporarily parole noncitizens into the United States, subject to certain exceptions.  8 U.S.C. § 1182(d)(5)(A).  This

provision states:

> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

*Id.* Federal courts may review the agency's section 1182(d) parole determinations — with respect to the grant, denial, and revocation of parole — for abuse of discretion based on the applicable statutes and regulations. *Jean v. Nelson*, 472 U.S. 846, 856-57 (1985).

**c.    Jurisdiction-stripping provisions**

As the government highlights, the INA contains several provisions which strip federal courts of jurisdiction over certain immigration matters.  Section 1252(a)(2)(B)(ii) states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review-
>
> > (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).  Section 1252(b)(9) cabins judicial review of removal orders and states that:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this

14

subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).  Finally, section 1252(g) states:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

The landscape on this issue has been developing rapidly.  In numerous cases in this district, the government has detained — without bond —  individuals already present within the United States, purportedly under 8 U.S.C. § 1225(b)(2)(A), arguing that the district court lacks jurisdiction to review the legality of such detention under 8 U.S.C. §§ 1252(g), 1252(b)(9), and 1252(a)(2)(B)(ii).  *Sharapov v. O'Neill*, 2026 WL 146668, at *2 (E.D. Pa. Jan. 20, 2026) (collecting cases).  And in those cases, courts without apparent exception have rejected the government's jurisdictional arguments because the petitioners were challenging the legality of their detention, not the government's initiation of removal proceedings against them.  *Id.* (citations omitted).  Recently, the Third Circuit also upheld a district court's finding that it had habeas jurisdiction over a noncitizen's petition challenging his immigration detention pending removal.  *Khalil v. President, United States*, 164 F.4th 259, 273 (3d Cir. 2026).

Notably, the petitioner in *Khalil* challenged both his removal and his detention while removal proceedings were pending and brought "only one detention-specific claim[,]" which the

Third Circuit viewed as indicating that the questions presented were "inextricably linked" to the removal process, rather than "wholly collateral" to such process. *Khalil*, 164 F.4th at 273-74, 277 (citation omitted). The Court concluded that the petition for review (PFR) process could meaningfully review the petitioner's claims, such that the INA precluded him from attacking his detention and removal *via* a habeas petition. *Id.* at 280-81. As we explain below, Mr. Gagiev's petition is distinguishable from Mr. Khalil's because Mr. Gagiev's claims solely challenge the legality of his detention and revocation of parole; he is not challenging his removal. Indeed, Mr. Gagiev's petition is more akin to those that have come before other courts in this district — over which those courts have exercised subject matter jurisdiction and in which they have ultimately granted habeas relief. *See, e.g.*, *Marcano v. Jamison*, 2026 WL 196504, at *1-*2 (E.D. Pa. Jan. 26, 2026) (concluding the court has jurisdiction over petitioners' habeas claim, in the context of parole revocation, because their claim challenged the legality of their detention); *Kourouma v. Jamison*, 2026 WL 120208, at *3 (E.D. Pa. Jan. 15, 2026) (finding the petitioner's claims were not "inextricably linked to his removal proceedings" because he solely "challenge[d] the Government's authority to detain him without a bond hearing.") (citation modified). Accordingly, we view Mr. Gagiev's claims as "wholly collateral" to the removal process, rather than "inextricably linked" to such process, such that they fall squarely within our authority to adjudicate his request for habeas relief. *Khalil*, 164 F.4th at 274.

## IV.    DISCUSSION

### A.    We have habeas jurisdiction to review Mr. Gagiev's claim that he is being unlawfully detained

Mr. Gagiev challenges the lawfulness of his detention and, as such, he raises a core habeas claim over which we have jurisdiction. Akin to the petitioner in *St. Cyr* — over whom

habeas jurisdiction was exercised — Mr. Gagiev does not challenge the facts establishing his removability nor the conclusion that he is removable, nor does he assert any right to judicial review of the Attorney General's exercise of discretion with respect to any applicable waivers or other relief. *St. Cyr*, 533 U.S. at 293, 298. Indeed, the *St. Cyr* Court explicitly concluded that general habeas jurisdiction was not barred by the IIRIRA (which amended the INA with respect to, *inter alia*, sections 1225, 1226, and 1252) — let alone precluded by the provisions invoked as jurisdictional bars by the government in that case — which were INA sections 1252(a)(1), 1252(a)(2)(C), and 1252(b)(9). *Id.* at 312-314 (citations omitted). And this makes sense, given the strong presumption in favor of judicial review of questions of statutory interpretation and constitutional law, and the particularly clear statement required by Congress to preclude habeas review. *Kim*, 538 U.S. at 517 (citing *St. Cyr*, 533 U.S. at 298, 308-09). None of the INA provisions cited by the government contain any such particularly clear statement.

First, section 1252(a)(2)(B)(ii), which precludes our review of decisions by the Attorney General or DHS Secretary "the authority for which is specified under this subsection to be in [their] discretion" does not apply here. 8 U.S.C. § 1252(a)(2)(B)(ii). Mr. Gagiev is not challenging the discretionary decision to detain him; he is challenging the statutory authority to do so. *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (explaining that the extent of the Attorney General's authority to detain the individuals "under the post-removal-period detention statute" was "not a matter of discretion.") (citations omitted). This comes down to the legal question of whether Mr. Gagiev is subject to mandatory detention — in other words: does section 1225 or 1226 apply to him? Section 1252(a)(2)(B)(ii) does not preclude our review of this question.

Section 1252(b)(9) does not preclude our review, either. This provision bars "[j]udicial

review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States" except for through the "judicial review of a final order[.]"  8 U.S.C. § 1252(b)(9).  But Mr. Gagiev does not ask us to review any question of law or fact arising from removal proceedings; he asks us to review the government's interpretation of the statutory detention framework as applied to him.  This is a question of whether Mr. Gagiev is being illegally detained, and such a question is immediately reviewable *via* a habeas petition "because illegal detention cannot be remedied later."  *Khalil*, 164 F.4th at 275.[9]  The *Jennings* plurality provides further helpful context, explaining that section 1252(b)(9) does not preclude judicial review when the petitioners are not (1) "asking for review of an order of removal"; (2) "challenging the decision to detain them in the first place or to seek removal"; nor (3) "challenging any part of the process by which their removability will be determined."  *Jennings*, 583 U.S. at 294-95.  Section 1252(b)(9) thus does not preclude our review here.

Nor does section 1252(g) present a barrier to our review.  Subject to certain exceptions, this section precludes judicial review of "any cause or claim by or on behalf of any alien arising

---

[9] In *Khalil*, the Third Circuit analyzed the scope of section 1252(b)(9).  It began by explaining that detention constitutes an "action taken" as part of an individual's removal proceedings, and that removal proceedings constitute "proceedings brought to remove an alien." *Id.* at 273 (citing *Carlson v. Landon*, 342 U.S. 524, 538 (1952); *E.O.H.C. v. Sec'y, U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 184 (3d Cir. 2020)).  But that didn't end the inquiry.  Rather, the Court noted that the question was "whether [Mr.] Khalil's claims 'arise[e] from' that action or proceeding."  *Id.*  The Court explained that claims do not "'aris[e] from' the 'action[s] taken' or 'proceeding[s] brought' to remove" the individuals when the individuals "raise claims that courts cannot 'meaningfully' review from the PFR process."  *Id.* at 274 (citation omitted).  Thus, section 1252(b)(9) will not preclude judicial review when the petitioner raises "legal or factual questions that a court of appeals will not later be able to review meaningfully on a PFR."  *Id.* at 274-75.  The Third Circuit explicitly held that an individual challenging the legality of the basis for their detention (such as, for example, a constitutional vagueness challenge to the INA provision rendering him removable) could bring such a claim immediately for habeas review because illegal detention constitutes a now-or-never question.  *Id.* at 275.

from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Supreme Court interprets this language narrowly, concluding that it "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). It does not preclude the "many other decisions or actions that may be part of the deportation process[,]" *id.* — like the decision to detain an individual under a certain statutory basis. Section 1252(g) does not bar review.

## B.    Mr. Gagiev is not subject to mandatory detention under section 1225, such that his present detention under that provision is unlawful

The government asserts that Mr. Gagiev is lawfully detained pursuant to 8 U.S.C. § 1225(b). DI 4 at 16. This is the sole authority upon which the government relies to detain Mr. Gagiev. DI 8 at 1-2. But as we have concluded several times — alongside the overwhelming majority of courts across the country and every court in this district that has considered the issue — section 1225(b) does not apply to individuals like Mr. Gagiev who are already here.[10]

---

[10] *Diop v. Jamison, et al.*, No. 25-cv-6946, ECF 7 at 3 (joining "the 'vast majority' of courts confronted with this issue" of whether resident noncitizens are subject to detention under section 1225 or section 1226 and that "have rejected the government's position" that section 1225 applies, "including all 50 decisions from judges in this district to date.") (citing *Patel v. McShane*, 2025 WL 3241212 (E.D. Pa. Nov. 20, 2025) (Brody, J.); *Ndiaye v. Jamison*, 2025 WL 3229307 (E.D. Pa. Nov. 19, 2025) (Sánchez, J.); *Demirel v. Fed. Det. Ctr. Philadelphia*, 2025 WL 3218243 (E.D. Pa. Nov. 18, 2025) (Diamond, J.); *Kashranov v. Jamison*, 2025 WL 3188399 (E.D. Pa. Nov. 14, 2025) (Wolson, J.); *Cantu-Cortes v. O'Neill, et al.*, 2025 WL 3171639 (E.D. Pa. Nov. 13, 2025) (Kenney, J.); *Centeno Ibarra v. Warden of the Federal Detention Center, et al.*, 2025 WL 3294726 (E.D. Pa. Nov. 25, 2025) (Rufe, J.); *Buele Morocho v. Jamison, et al.*, 2025 WL 3296300 (E.D. Pa. Nov. 26, 2025) (Gallagher, J.); *Diallo v. O'Neill, et al.*, 2025 WL 3298003 (E.D. Pa. Nov. 26, 2025) (Savage, J.); *Rios Porras v. O'Neill, et al.*, 2025 WL 3708900 (E.D. Pa. Nov. 25, 2025) (Beetlestone, C.J.); *Wu v. Jamison, et al.*, No. 25-cv-6469 (E.D. Pa.

Nor is Mr. Gagiev subject to mandatory detention under section 1225(b) by virtue of the termination of his parole. In reaching this conclusion, we concur with the persuasive interpretations of numerous courts, both in this district and across the country, which have found that section 1225(b)(1) does not authorize the expedited removal and detention of noncitizens who were paroled into the United States under section 1182(d)(5)(A). *See, e.g.*, *Vasquez-Rosario*, 2026 WL 196505 at *7; *Rodriguez-Acurio v. Almodovar*, 2025 WL 3314420, at *14 (E.D.N.Y. Nov. 28, 2025) (citing cases). We have already established that Mr. Gagiev does not fall within the "Arriving Aliens Provision" because he is not "arriving in the United States" — he has been living here. 8 U.S.C. § 1225(b)(1)(A)(i). The only other way he can come within the scope of section 1225(b) would be under the "Designation Provision" codified at 8 U.S.C. 1225(b)(1)(A)(iii)(II). Mr. Gagiev is not covered by this provision.

The Designation Provision pertains to "an alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously

---

Dec. 1, 2025) (Gallagher, J.); *Flores Obando v. Bondi*, 2025 WL 3452047 (E.D. Pa. Dec. 1, 2025) (Brody, J.); *Valdivia Martinez v. FDC*, No. 25- cv-6568 (E.D. Pa. Dec. 1, 2025) (Savage, J.); *Soumare v. Jamison*, 2025 WL 3461542 (E.D. Pa. Dec. 2, 2025) (Henry, J.); *Yilmaz v. Warden, FDC*, 2025 WL 3459484 (E.D. Pa. Dec. 2, 2025) (Rufe, J.); *Nogueira-Mendes v. McShane*, 2025 WL 3473364 (E.D. Pa. Dec. 3, 2025) (Slomsky, J.); *Juarez Velazquez v. O'Neill, et al.*, 2025 WL 3473363 (E.D. Pa. Dec. 3, 2025) (Henry, J.); *Perez-Suspes v. Rose, et al.*, 2025 WL 3492820 (E.D. Pa. Dec. 5, 2025) (Brody, J.); *Delgado Villegas v. Bondi, et al.*, No. 25-cv-6143 (E.D. Pa. Dec 4, 2025) (Diamond, J.); *Hidalgo et al. v. O'Neill, et al.*, No. 25-cv-6775 (E.D. Pa. Dec. 5, 2025) (Diamond, J.); *Conde v. Jamison, et al.*, 2025 WL 3499256 (E.D. Pa. Dec. 5, 2025) (Brody, J.); *Rodrigues Pereira v. O'Neill, et al.*, 2025 WL 3516665 (E.D. Pa. Dec. 8, 2025) (Marston, J.); *Bhatia v. O'Neill, et al.*, 2025 WL 3530075 (E.D. Pa. Dec. 9, 2025) (Rufe, J.); *Anirudh v. McShane, et al.*, 2025 WL 3527528 (E.D. Pa. Dec. 9, 2025) (Bartle, J.); *AcostaCibrian*, No. 25-cv-6650 (E.D. Pa. Dec. 9, 2025) (Gallagher, J.); *Picon v. O'Neill, et al.*, 2025 WL 3634212 (E.D. Pa. Dec. 15, 2025) (Perez, J)).

for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph."  8 U.S.C. 1225(b)(1)(A)(iii)(II).  Mr. Gagiev has not been continuously present in the United Sates prior to the determination of his inadmissibility.  But, as numerous other courts have persuasively concluded, we find that the fact that Mr. Gagiev was temporarily paroled into the United States means that he "has . . . been . . . paroled into the United States" within the meaning of section 1225(b)(1)(A)(iii)(II), such that he does not fall within the Designation Provision.  Here's why we agree.

The text[11] of section 1225(b)(1)(A)(iii)(II) uses the past tense "has not been . . . paroled into the United States" — indicating that it applies to individuals who have not, at any point, been paroled into the United States.  8 U.S.C. 1225(b)(1)(A)(iii)(II).  The text does not state that it applies to a noncitizen who "is not currently on parole."  *See, e.g.*, *Coalition for Humane Immigrant Rights v. Noem*, 805 F.Supp.3d 48, 83 (D.D.C. 2025) (stating "the Designation Provision forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States."); *Vasquez-Rosario*, 2026 WL 196505 at *7 (explaining this textual distinction); *Rodriguez-Acurio*, 2025 WL 3314420 at *15 (same); *see also Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) (noting that "Congress' use of a verb tense is significant in construing statutes.") (citation modified) (citation omitted).

Even if we explored arguable ambiguities in the text, as some courts have,[12] the canons

---

[11] Of course, we must start "with the statutory text and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citation modified) (citation omitted).

[12] *Rodriguez-Acurio*, 2025 WL 3314420 at *15 (finding "ambiguity in the phrase 'has not

of statutory interpretation also support the conclusion that the Designation Provision does not

apply to Mr. Gagiev because he was previously paroled into the United States.  The juxtaposition

of "admitted" and "paroled" in the phrase "admitted or paroled into the United States" indicates

that admission and parole, in this context, refer to how the individual entered the United States

(*i.e.*, he entered the country by manner of admission or parole) because "admitted" only refers to

an individual's manner of entry — not his status.  *See, e.g.*, *Rodriguez-Acurio*, 2025 WL

3314420 at *16 (utilizing this reasoning) (citations omitted).  Construed as such, an individual is

"paroled" within the meaning of section 1225(b)(1)(A)(iii)(II) at a discrete moment in time —

for Mr. Gagiev, this moment occurred on January 2, 2025.  The use of the preposition "into" in

the phrase "paroled into the United States" further suggests that Congress was describing an

individual's entrance inside a place, not his status as a parolee.  *Rodriguez-Acurio*, 2025 WL

3314420 at *16 (similarly reasoning) (citations omitted).  And this reading also makes the most

sense in the context of the INA as a whole.  Section 1182(d)(5)(A) states that parole "shall not be

regarded as an admission of the alien" — again suggesting that parole is an event that occurs at a

discrete moment in time.  8 U.S.C. § 1182(d)(5)(A); *Coalition*, 805 F.Supp.3d at 85-86.  This

provision further provides parole as "a third option" for "applicants for admission[,]" indicating

an individual is an "applicant[] for admission" while his parole is active.  8 U.S.C.

§ 1182(d)(5)(A); *Coalition*, 805 F. Supp. 3d at 86 (citing *Biden v. Texas*, 597 U.S. 785, 806

(2022)).  But, critically, the provision states that, if a noncitizen's parole is terminated, he must

---

been . . . paroled into the United States" but concluding, in agreement with *Coalition*, 805 F. Supp. 3d at 83, that the "text of the Designation Provision prohibits 'the expedited removal of noncitizens who have been, at any point in time, paroled into the United States.'") (citation modified) (citations omitted).

"return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). If a noncitizen is an "applicant[] for admission" while his parole is active, then his "return . . . to the custody from which he was paroled" does not return him to the status of an applicant for admission who is just arriving at the border because he already has the "applicant for admission" status of someone who has been residing in the United States. *Coalition*, 805 F. Supp. 3d at 86 (applying this reasoning). Rather, the noncitizen whose parole ends must "continue" to be treated as an applicant for admission, just like all the other undocumented individuals already living in the United States who are "applicant[s] for admission" and are not subject to expedited removal. *Vasquez-Rosario v. Noem*, 2026 WL 196505 at *8 (citations omitted). Such individuals are subject to section 1226. *Chi Thon Ngo v. INS*, 192 F.3d 390, 392 n.1 (3d Cir. 1999) ("When parole is revoked, the alien reverts to the status of an applicant for admission, whose admissibility is determined in exclusion or the more recent removal proceedings.") (citing 8 U.S.C. § 1226 (1994)).

The entry fiction doctrine does not alter our conclusion that section 1225 does not apply to Mr. Gagiev. Articulated in *Mezei* and further elaborated upon in *Thuraissigiam*,[13] this

---

[13] *Kaplan v. Tod*, 267 U.S. 228 (1925), and *Leng v. Barber*, 357 U.S. 185 (1958), also illustrate the entry fiction doctrine. *Kaplan* dealt with a noncitizen who was brought to the United States, ordered excluded, and kept at Ellis Island for approximately one year due to the suspense of deportation during World War I. *Id.* at 229. She was then given to the custody of an immigrant aid group, who maintained control over her but allowed her to live with her father. *Id.* at 229. Her father became a naturalized U.S. citizen during this time. *Id.* The Court ruled she did not become a citizen herself by virtue of her father's naturalization because she was not "dwelling in the United States" at the time, given that (1) while at Ellis Island "she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared"; and (2) she remained in this status even "[w]hen her prison bounds were enlarged

doctrine treats noncitizen parolees — for due process purposes — as if they remain at the U.S. border. It holds that, with respect to "an alien on the threshold of initial entry[,]" "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Mezei*, 345 U.S. at 212 (citations omitted). Consistent with our above analysis, we conclude that "the procedure authorized by Congress" for persons such as Mr. Gagiev, who had been paroled into the United States and developed substantial connections within it prior to their detention, is detention pursuant to 8 U.S.C. § 1226 — not § 1225.

First, we note that neither *Mezei* nor *Thuraissigiam* — nor *Kaplan* nor *Leng* — addressed section 1225 and whether it applies to individuals paroled into the United States. Indeed, *Mezei*, *Kaplan*, and *Leng* were all decided before the passage of IRRIRA. We find it especially critical that these cases did not address section 1225 because, as detailed previously, section 1225's Designation Provision explicitly states that it applies to "an alien . . . who has not been admitted or paroled into the United States[.]" 8 U.S.C. 1225(b)(1)(A)(iii)(II). Under our interpretation of section 1225, this language suggests a specific event in time — the event of paroling an individual into the United States — not the **status** of "parolee." Section 1225(b)(1)(A)(iii)(II)

---

by committing her to the custody of the Hebrew Society" because "[s]he was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.* at 230 (citations omitted). *Leng* involved the parole of a noncitizen, deemed excludable, who sought withholding of deportation. *Leng*, 357 U.S. at 185-86. The noncitizen was held in custody for more than one month before she was released on parole, and three months later, she received an order of exclusion. *Id.* at 186. She then surrendered for deportation approximately one year later, after which she filed a habeas petition. *Id.* The Court focused on the noncitizen's status and emphasized that her parole into the country did not impact her status; in other words, parole did not "place[] her legally 'within the United States'" as understood by the withholding of removal statute then in effect. *Id.* at 190. Thus, it held that she, as a noncitizen parolee, was not eligible for withholding of removal because she had not entered the United States as understood by the withholding statute. *Id.* at 186, 190.

does not state that it applies to individuals who are, as a matter of status, no longer parolees. The logic of the entry fiction doctrine, which rests on the status of a parolee as an individual at the threshold of entry, thus does not appear applicable to the specific statutory language of section 1225. Moreover, *Thuraissigiam* — the only of these four cases to post-date the enactment of sections 1225 and 1226 — supports our interpretation that section 1226, not section 1225, applies to Mr. Gagiev. There, the court indicated that, had Mr. Thuraissigam been released from custody, "[w]ithout a change in status, he would remain subject to arrest, detention, and removal" under sections 1226(a) and 1229a(e)(2). *Thuraissigam*, 591 U.S. at 119 (citing 8 U.S.C. §§ 1226(a), 1229(e)(2)). Notably missing from this reasoning is any statement that section 1225 would apply to a noncitizen released from immigration custody.

We also find it important to note some key factual distinctions between Mr. Gagiev's case and cases involving the application of the entry fiction doctrine — which, again, did not occur in the context of section 1225. Upon arriving to the United States *via* boat,[14] Mr. Mezei was deemed a national security risk and was harbored by the U.S. government on Ellis Island, where he remained under the government's custody and control. *Mezei*, 345 U.S. at 213, 216. Ms. Kaplan also was held on Ellis Island by the government, after which she was transferred (by order of the government) to the custody of an immigrant aid group pending her deportation. *Kaplan*, 267 U.S. at 229-30. Mr. Thuraissigam was apprehended 25 yards from the U.S. border after attempting to enter the United States illegally, immediately detained by DHS for expedited removal, and received a final order of removal from an immigration judge. *Thuraissigam*, 591

---

[14] Mr. Mezei, who was born abroad, had previously lived in the United States for approximately 25 years before he traveled to Europe. *Mezei*, 345 U.S. at 208. He was detained upon his attempted return from Europe to the United States. *Id.*

U.S. at 107, 114.  At this point, Mr. Thuraissigiam filed a habeas petition in which he sought

vacatur of the removal order and an opportunity to apply for asylum and other relief from

removal.  *Id.* at 117-18.  Ms. Leng was held in custody for over a month before she was released

on parole; three months later she received an order of exclusion, after which she eventually

surrendered for deportation and sought withholding of removal.  *Leng*, 357 U.S. at 186.

Mr. Gagiev's situation is very different.  He presented himself to immigration authorities

at the U.S. border, received a screening interview for his asylum claim, and was paroled into the

United States.  DI 1 at ¶¶ 2-3; DI 13 at 13-14.  While paroled, Mr. Gagiev was not under the

custody or control of immigration authorities; he did not even have an ankle monitor.  DI 13 at

13-14.  Mr. Gagiev was allowed to maintain a residence in Philadelphia, obtain work

authorization, obtain a job, and go about his life here — with instructions only to return for his

check-in one year later.  *Id.*  Thus, unlike Mr. Mezei, Ms. Kaplan, Mr. Thuraissigiam, and Ms.

Leng, Mr. Gagiev (1) was not in the custody or control of the government, or an agent ordered

by the government to maintain control over him, during his parole or following the termination

thereof, until he was detained this January; (2) was authorized to work; and (3) developed

substantial connections to the United States[15] over the course of a year.  We believe these

---

[15] *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), suggests that "substantial connections with the [United States]" matter.  *Id.* at 271 (citations omitted).  Here, the Court addressed whether the Fourth Amendment applied to a search and seizure of property by U.S. agents, located in a foreign nation, and "owned by a nonresident alien."  *Id.* at 261.  In characterizing its precedent finding that "aliens enjoy certain constitutional rights[,]" the Court clarified that such cases "establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with the country."  *Id.* at 270-71 (citations omitted).  Because the individual was "an alien who has had no previous significant voluntary connection with the United States" those "cases avail[ed] him not."  *Id.* at 271.  Ultimately, the Court concluded that the Fourth Amendment did not apply

distinctions are material.

Accordingly, Mr. Gagiev does not fall under the Designation Provision, nor any other provision of section 1225(b).  His detention pursuant to section 1225(b), during which he has been denied a bond hearing, thus is unlawful.

**C.    Even if the government purported to detain Mr. Gagiev under section 1226, which it does not so claim, the government has not followed the required process for doing so**

The government does not offer any basis for detaining Mr. Gagiev other than section 1225(b).  DI 8 at 1-2.  We will briefly explain why we agree with Mr. Gagiev that section 1226 applies to him, such that any detention of Mr. Gagiev requires a bond hearing.  Because the government failed to provide Mr. Gagiev with this required process, it violated his statutory and constitutional due process rights.

Section 1226 of the INA applies to individuals like Mr. Gagiev who are "already present in the United States." *Jennings*, 583 U.S. at 303 (citing 8 U.S.C. § 1226).  By default, individuals like Mr. Gagiev also fall under section 1226(a) — they only fall under section 1226(c) if they meet specific crime-related criteria.  *Id.* at 306 (citing 8 U.S.C. § 1226(a), (c)). The government does not contend that Mr. Gagiev is covered by section 1226(c), nor is there any reason in the record to believe that he is so covered.  Accordingly, section 1226(a) applies, and under the applicable federal regulations, Mr. Gagiev must receive a bond hearing at the outset of his detention.  *Id.* (citing 8 U.S.C. §§ 1225(a), (c); 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)).  The government's failure to provide Mr. Gagiev with a bond hearing was thus unlawful.

---

to the search because, when the search occurred, the individual was a Mexican citizen and resident "with no voluntary attachment to the United States, and the place searched was located in Mexico."  *Id.* at 274-75.

This failure to provide a bond hearing also violates Mr. Gagiev's due process rights under the Fifth Amendment. "[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 698 (citation modified) (citations omitted). Applying the well-known *Matthews* factors, we conclude that due process requires a pre-deprivation bond hearing for Mr. Gagiev because (1) he has a strong liberty interest at stake; (2) the lack of any individualized assessment respecting Mr. Gagiev generates a high risk of erroneous deprivation of Mr. Gagiev's rights, that a bond hearing could help protect against; and (3) the requirement of a bond hearing imposes, at best, a minimal administrative burden on the government. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *see also Kashranov*, 2025 WL 3188399 at *5 (applying the *Matthews* factors in this context).

## V.    CONCLUSION

Mr. Gagiev's detention without a bond hearing, pursuant to 8 U.S.C. § 1225(b), is both statutorily and constitutionally unlawful. Accordingly, we grant Mr. Gagiev's habeas petition to the extent that we order his immediate release from detention as set out in the accompanying order. Because we do so, we decline to address Mr. Gagiev's other claims.